## McGEE *v*. CARLTON LUMBER CO.

(151 Pac. 652.)

**Master and Servant—Injuries to Servant—Workmen's Compensation Act.**

1.  Plaintiff, a teamster, was injured by coming in contact with a mono-rail transfer while driving a wagon on a dock of the defendant. The wagon crowded the horses, one of which was fractious, and plaintiff nearly lost his balance, and in attempting to hold on raised his head, which came in contact with the plank of the mono-rail, which was only six inches above the top of the wagon-bed. *Held*, that plaintiff's action was governed by the Employers' Liability Act (Laws 1911, p. 16), and the master could take advantage of neither the defense of contributory negligence nor assumption of risk; the place of work and appliances being dangerous.

> [As to who is "workingman" within meaning of the Workmen's Compensation Act, see note in Ann. Cas. 1913C, 28.

**Trial—Personal Injuries—Instructions—Requests.**

2.  Where no more specific instruction was requested, an instruction charging the jury that, if the servant was permanently injured, they should estimate what he was actually worth as a wage-earner by considering how many years he would have an earning capacity, and what would be a reasonable wage under the evidence, and should allow compensation only for the damages sustained by the injury, was sufficient.

From Yamhill: Webster Holmes, Judge.

In Banc.    Statement by Mr. Justice Bean.

This is an action brought by the plaintiff, M. A. McGee, against the defendants, the Carlton Lumber

Company and the Carlton Fir Lumber Company, to recover damages for a personal injury he received on April 28, 1914, while in their employ. McGee was employed as a teamster by the defendants, and was injured by coming in contact with a mono-rail transfer while driving a wood wagon upon one of their docks. The plant of the defendants, so far as material here, is located upon the ordinary docks which are to be found around ordinary lumber-yards. Their sawmill and planing-mill are situated at the extreme west end of the plant, and at that point slabs accumulate as the logs are sawed. When some member of the companies desires a load of wood, it is delivered to him by their employees by a team and wagon belonging to the companies. The wagons used for this purpose are similar to those in use in other woodyards. They are so constructed that the bed may be pushed backward by means of a crank, so that it will dump its contents. A board about 80 inches in width and 30 inches in length is placed on the extreme front and on a level with the bottom part of the bed. There is no brake on the wagon. The docks of the defendant companies are at no point more than 10 or 12 feet above the ground. They are merely plank driveways over which lumber is transported from one part of the yard to another. The defendants have what is known as the mono-rail, which is operated upon a stationary track consisting of one rail a number of feet above the ground. By means of this mono-rail lumber is carried from one part of the yard to another. They also have what is called a mono-rail transfer, which consists of two large timbers more than 50 feet apart and about 8 feet above the floor of the dock. At the time the plaintiff received his injury he was driv-

ing one of these wood wagons from the dock. After he had passed under the west timber of the mono-rail transfer, as he stated, he thought he heard someone call, raised up from the board or seat which was on the bottom of the bed of the wagon, and while standing up came in contact with the east timber of the mono-rail transfer, thereby catching his head between it and the wagon-bed, producing the injury.

The plaintiff alleged that the harness used on the horses which he was driving had no breeching; that there was no brake on the wagon, and by reason thereof, on account of a slight descent to pass under the mono-rail timbers, the wagon ran forward and caused the horses to move at a more rapid rate of speed than they would otherwise have done; that one of the horses was fractious and the team hard to manage; that the heavy supporting timbers of the mono-rail were too close to the driveway and to the top of the load or wagon-bed containing wood, leaving no room for the driver to stand on any part of the wagon and pass under the mono-rail; that the roadway beneath the mono-rail timbers sags or slopes, making either end thereof slanting; that there were no warning signs or notices of any kind above or near the timbers of the mono-rail to caution the workmen of their approach thereto; that there was no foot-rest whereby the driver could brace himself, and no handhold or safeties with which the driver could steady himself or hold to while driving the team down the incline—all of which could have been provided for without destroying the efficiency of the structure or work.

The defendants' answer is framed upon the theory of a common-law action and sets forth the following defenses: (1) Assumption of risk; and (2) contribu-

tory negligence. The reply put in issue the affirmative defenses. Upon the trial a verdict was rendered in favor of plaintiff for the sum of $2,000. To obtain a reversal of the judgment thereon, the defendants appeal.                                              Affirmed.

For appellants there was a brief over the names of *Mr. F. C. Howell, Mr. A. L. Clark* and *Messrs. Wilbur, Spencer & Beckett,* with oral arguments by *Mr. Howell* and *Mr. Clark.*

For respondent there was a brief over the names of *Mr. Isham N. Smith, Mr. B. A. Kliks, Mr. Lon L. Parker* and *Mr. Richard Talboy,* with an oral argument by *Mr. Smith.*

Mr. Justice Bean delivered the opinion of the court.

The defendants claim that the action comes within the rules of the common law and requested an instruction accordingly. The court refused this request, and instructed the jury according to the provisions of the Employers' Liability Act. The defendants assign this as error.

1. A summary of the plaintiff's evidence furnishes a fair setting for the case. He testified in part as follows:

"A. My orders was, when I went out of the barn, by the barn boss, Mr. Schaer, to get the load as soon as possible, and he would wait for me up to the barn. And I went down, and I can't remember whether I took down a load of lumber to the planing-mill or not; but anyway I went and got the load of wood as soon as I could get it, and come up to the driveway you are supposed to drive into, and it was blocked with three truck-loads of lumber, two side by side, and the other in ahead. I forget which side of the driveway they

were on, but two side by side here, and the other one over on this side, and you couldn't get through with one horse single, and Swanson, one of the teamsters, was down by the mono-rail, and I stopped my team by the first turn as I got up on the main driveway, and Swanson, knowing what the orders was, hollered for me to come up.   I hollered up, 'Is it open?' and he says it was not open, 'but there is one; I will pull it across so as to let you through,' which he did.   He passed me just around the corner from the mono-rail.   I turned and started down under the mono-rail and sat down on the foot-rest or seat, whichever you might call it, to avoid danger.   No breeching on my harness, no brake on the wagon, and no self-guard for a man whatever, not even a finger hole to grab hold of, unless you grabbed hold of the wagon.   In going down I had the lines in both hands to hold the horses, they were a little hard in the mouth, and that load crowding them there, and they were not deadheads, wouldn't stand no whip, they got to going, and no foot-rest—there is a chain that holds up the tongue, that runs out in front, that is the only foot-rest there is. * *

"Q. Go ahead and tell what you did.

"A. Well, that is all the foot-rest you've got, and when I got down the hill it tipped so I was practically off the seat, and I knew what the result would be if I fell.   I would get run over, if I didn't get kicked to pieces by that fractious horse. * *

"A. I was practically off the seat when I got down this first driveway.   This first incline to show you here.   I took my hand up on this, holding the lines in one hand, to pull myself up, and I wouldn't be positive somebody hollered, which was frequently done if they wanted one of the teamsters, or whistle, and in case they don't hear, they might see them and motion to come there, and at the time I pulled myself up, thinking that hollering was behind me.   Why then, as I pulled myself up, the timber must have hit me in the head and drove my face right into the front end of the load of wood."

Other evidence detailed the circumstances and described the premises as stated above.   There is practically no controversy as to the main facts of the case. The main feature of the case is much the same as that in *Davis* v. *Carlton Lumber Co. et al., ante,* p. 441 (151 Pac. 650), in which an opinion has been this day rendered.   What was said in that case need not be repeated here.   The evidence tended to support the allegations of the complaint.   It disclosed that the work in which plaintiff was engaged involved a risk or danger to him; that there was a lack of the use of devices, care and precaution on the part of defendants for the protection and safety of life and limb; that an injury to plaintiff resulted; that it was practicable to have taken the necessary precautions.   The general clause of the Employers' Liability Act (Laws 1911, p. 16) applies to the facts in this case.   It requires all persons having charge of or responsible for any work involving a risk or danger to the employees or the public to use every device, care and precaution which it is practicable to use for the protection and safety of life and limb.   If there was not sufficient room to drive a loaded wagon under the supporting timbers of the mono-rail, it was the duty of the defendants to "have made sufficient room," or have refrained from using the space or driveway, according to the rule announced by the court through Mr. Justice Ramsey in *Wasiljeff* v. *Hawley Pulp & Paper Co.,* 68 Or. 487 (137 Pac. 755, at page 760, paragraph 6).

There is little room for argument but that the work was dangerous and the place unsafe to drive a team and wagon under timbers with a space of  only about  6 inches between the top of the wagon-bed and the timbers.   It would seem that the other accouterments com-

plained of tended to increase the danger. There was no error in charging the jury according to the provisions of the Employers' Liability Act, and that the defenses of assumption of risk and contributory negligence pleaded by defendants were not available: *Wolsiffer* v. *Bechill Bros.*, 76 Or. 516 (146 Pac. 513).

2. Defendants' counsel objected and excepted to that part of the charge to the jury pertaining to the measure of damages for a permanent injury. The court instructed the jury, in effect, that, if they found that the plaintiff was permanently injured, they should estimate what he was actually worth as a wage-earner, by considering how many years he would have an earning capacity, what would be a reasonable wage, and how much he would earn, and all the elements shown by the evidence, and by only allowing compensation for the damages he sustained by reason of the injury. It is urged that the illustration used by the court was of a different import, but we do not so construe the instruction taken as a whole. We find no request for a more specific instruction upon this point. The verdict does not indicate that the jury was misled by the illustration used by the court. Under the circumstances, we think the charge was sufficient: *McClaugherty* v. *Rogue Riv. Elec. Co.*, 73 Or. 135 (140 Pac. 64, 144 Pac. 569).

We find no reversible error in the record. The judgment of the lower court is therefore affirmed.

AFFIRMED.

MR. JUSTICE McBRIDE did not sit.